Filed 3/4/26  In re J.F. CA4/3

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

### FOURTH APPELLATE DISTRICT

### DIVISION THREE

| | |
|---|---|
| In re J.F., a Person Coming Under the Juvenile Court Law. | |
| ORANGE COUNTY SOCIAL SERVICES AGENCY,<br><br>    Plaintiff and Respondent,<br><br>        v.<br><br>M.F.,<br><br>    Defendant and Appellant. | G065838<br><br>(Super. Ct. No. 25DP0570)<br><br>O P I N I O N |

Appeal from orders of the Superior Court of Orange County, Jennifer McCartney, Judge. Affirmed in part and reversed in part.

Megan Turkat Schirn, under appointment by the Court of Appeal, for Defendant and Appellant.

Leon J. Page, County Counsel, Debbie Torrez and Deborah B. Morse, Deputy County Counsel, for Plaintiff and Respondent.

No appearance for Minor.

M.F. (Father) appeals from the juvenile court's jurisdictional findings and dispositional orders. After making jurisdictional findings as to J.O. (Mother) and Father, the court declared J.F. (the child) a dependent of the court and removed the child from the parents' custody pursuant to Welfare and Institutions Code section 361, subdivision (c) (all undesignated statutory references are to this code). Father contends his appeal is not moot, notwithstanding unchallenged jurisdictional findings as to Mother. He argues insufficient evidence supports the court's jurisdictional findings on counts b-2 and b-3. He argues the dispositional orders related to the jurisdictional findings should be reversed. Additionally, he contends the court erred in relying on section 361, subdivision (c) when it ordered the removal of the child from the parents' custody. He asserts the court should have placed the child with him under section 361.2, given he was a noncustodial parent.

We affirm in part and reverse in part. We find the appeal is not moot. We conclude substantial evidence supports the juvenile court's jurisdictional finding on count b-2 but does not support its jurisdictional finding on count b-3. As insufficient evidence supports the jurisdictional finding on count b-3 concerning "an unresolved substance use problem," we conclude the dispositional drug testing order must also be reversed. We conclude the court did not commit prejudicial error by denying Father's request for custody.

FACTUAL AND PROCEDURAL BACKGROUND

I.

DETENTION

On May 6, 2025, Mother, who is not a party to this appeal, grabbed the child's hair and wrists while trying to wake her up for school. The child walked outside and reported the incident to law enforcement. When

2

law enforcement arrived, they found the child outside, as Mother had locked her out of the home. They saw physical injuries consistent with the child's report, and the child was transported to the hospital. Law enforcement attempted to speak with Mother, but Mother refused to leave her home. An emergency protective order was issued to protect the child from Mother.

The child's family had been reported to the child abuse registry 78 times since 1998. Several of the child's half siblings had been dependents of the juvenile court. The child experienced frequent abuse by Mother. In late February 2025, law enforcement arrested Mother after observing scratches on the child's neck and after the child reported Mother punched and choked her.

On May 8, 2025, the child informed a social worker she had not spoken to Father in nearly two years. She reported Father sold drugs and that, the last time she visited him, she saw drugs, primarily marijuana, in his home. She also disclosed Father hit her in the past and that she felt unsafe returning to Father's care.

On May 9, 2025, Mother told a social worker Father had not exercised his visitation rights since September 2023. Mother reported Father had "been absent from the child's life and only came around when the child was in [third] grade." Mother said Father "was abusive to her" and a court had issued a ten-year restraining order against Father, which had expired. Mother reported she had sole custody of the child. She stated Father had "been physical with the child in the past during visitation" and had drug problems in the past. She shared "the child is fearful of [Father] and does not want to go with him or see him at all."

Father had a criminal history, including felony convictions. His last arrest was in 2008. In 2011 and 2012, there were child abuse referrals

3

alleging domestic violence between Father and Mother, with Mother allegedly attacking Father. In one incident in 2012, Father reported the child had bruises on her leg and ankle.

On May 13, 2025, Father reported he had visited the child. The child told him what had happened recently with Mother and that she wanted to go home with him, not Mother. Father also said he had not seen the child since February 2024 as Mother withheld visitation. Father did not enforce his visitation rights. After expressing frustration with the child welfare system and courts, Father "reported that if the child is not placed with him, '[he did not] want anyone with social services or the courts to contact [him] until [he saw his] child in the morgue from [Mother] abusing her.'"

The next day, the Orange County Social Services Agency (the Agency) obtained a protective custody warrant to remove the child from the parents' care. The child expressed relief upon receiving this news from a social worker. She informed the social worker Father had visited her and that "she would rather go back with [Mother] and deal with that than go live with [Father] because 'he is worse than [Mother].'"

On May 15, 2025, during a conversation with a social worker, the child expressed a preference to return home to Mother or to be placed with her friend's mother. When the social worker asked about Father, the child replied she had not talked with him recently and said, "[I] 'cut him off when I found out some things. Like a bunch of weed. He is very violent like [Mother] but a guy version.'" The social worker inquired what the child would do if her friend's mother and Mother were not options but if Father were. The child responded by asking "if group homes were an option." The social worker inquired further regarding the child's safety concerns with Father, but "the child was unable to articulate specific concerns."

4

On the same day, a social worker gave Father notice of the detention hearing. Father became upset, stating in part, "'You made the decision upon a false allegation against my home.'" When the social worker inquired about contact with the child, Father said the child "won't come to my home because there is structure and no child abuse. It is just my wife and [me]. [The child] has her own room." Father reported his eldest daughters were college graduates with careers and that his wife had a "stable career." He agreed to have the child at his home. Father explained he had the child in his care two years ago because Mother was "abusing the children in her home." Father expressed his frustration with the Agency for removing a half sibling from Mother's care but leaving the child with Mother "to be physically abused." Father reported he observed Mother was abusive, so he left the relationship. When the social worker asked Father whether he could "handle" the child given her behavior and cooperate with the Agency, Father said he "never spanked his children" and "successfully raised two other girls without abuse concerns." He denied concerns about his care of the child and "reiterated the issues arise when the child is with [Mother] as she lacks supervision." Father denied substance abuse and selling drugs. He admitted using marijuana recreationally, "but never in his home or near his children." Father said, "'[The child] is my life. I can't let [Mother] take her away from me.'"

In the detention report, the Agency recommended "detain[ing] the child at Orangewood Children's Home/Emergency Shelter Home/Hospital/other facility with an authorization to release the child to a parent, relative[,] or suitable adult pending [j]urisdictional and [d]ispositional hearing."

On May 16, 2025, the Agency filed a petition, alleging the child came within the jurisdiction of the juvenile court pursuant to section 300, subdivisions (a) (serious physical harm), (b)(1) (failure to protect), and (j) (abuse of sibling).

On the same day, a social worker assessed Father's home. The social worker "did not observe any alcohol, drugs[,] or drug paraphernalia within the home." Father's wife was present and shared she and Father had been married since 1990. She denied any safety concerns. Father "apologized for how he came off over the phone but felt exhausted with the continuous fight with [Mother] regarding the child's wellbeing." Father denied any domestic violence against Mother and any physical discipline.

In an addendum to the detention report, following Father's home assessment, the Agency recommended the juvenile court "dismiss the petition with exit orders, with physical custody to [Father] and joint legal custody to the parents with supervised visitation for [Mother]." It explained Father "has expressed the desire and willingness to care for the child, agreeing to ensure the child's needs are met" and that Father would cooperate "to ensure the child received appropriate services."

The juvenile court held a detention hearing on May 19, 2025. The Agency requested the court adopt the detention report's recommendation, rather than the addendum's recommendation, to detain the child from the parents. The Agency indicated it had approved an emergency placement with a nonrelative extended family member. Father requested the court place the child "in his care and custody." He argued he "had nothing to do with" the allegations of Mother's physical abuse, which brought about the instant case. He asserted "a lot of things . . . are very historical in nature and old" and should not be used as a "basis to detain the child from" him.

6

The juvenile court found the Agency made a prima facie showing the continued detention of the child was necessary. (§ 319.) As to Father, the court cited the family's "substantial history" of referrals, the child's reports of Father's physical abuse when she previously visited him, the child's fear of residing with him, and the lack of contact between the child and Father since February 2024. The court ordered the placement of the child with the nonrelative extended family member. It ordered monitored visits for parents. While issuing orders, the court noted on the record Father "chose to walk out of the proceedings."

II.

JURISDICTION AND DISPOSITION

On May 27, 2025, a social worker called Father. Father "spoke with a firm tone" and said he would "not be 'jumping through hoops'" or visiting the child. He accused the child of lying during the detention hearing. He denied ever selling drugs and said he has a business that provides services to law enforcement. Father stated he spent "thousands of dollars" during court proceedings between 2012 and 2022 in a dispute with Mother "and nothing positive came from it." Father disparaged the social worker as "'half his age'" and as only being at the Agency "to collect a paycheck." Father asserted the Agency was "a 'human trafficking organization'" and had failed the child. Father said, "'I'm done.'" When the social worker tried to schedule an appointment to discuss services and visitation, Father replied, "'[D]on't bother me with . . . nonsense.'" Father thereafter did not make himself available for interviews, including for recommended services, like counseling, anger management, parenting education, or visits.

On June 2, 2025, a social worker interviewed the child at her placement and asked the child whether she wanted to live with Father. The

child answered, "'[N]o, I want to live here.'" She explained Father sells drugs and she did not "'want to be around him.'" The child said when she lived with Father two years ago, "[F]ather was 'aggressive and always yelling,'" and, although he never hit her, he came close to hitting her at least once. When the social worker asked the child how she knows Father sells drugs, the child responded, "'I found a bunch of weed under the cabinet.'" The child declined in-person visits and telephone calls from Father and preferred to avoid contact with Father.

The jurisdiction and disposition report recommended the juvenile court sustain the petition's allegations and declare the child a dependent of the court. The Agency noted it was unable to speak with Father regarding the allegations during its investigation at that stage.

On July 15, 2025, the child reported Father had called her four times over the course of approximately 45 minutes. She said when she answered her phone, Father yelled, "'[Y]ou lied on my name,'" and asserted he would not attend any future hearings. She stated she hung up because she did not want to hear her Father yelling.

The Agency filed three addendums to the jurisdiction and disposition report, and maintained the recommendation made in the original jurisdiction and disposition report.

On August 7, 2025, the juvenile court held a jurisdiction and disposition hearing. Father was not present. At the hearing, the child testified as follows regarding Father. She recalled Father hit her when she was approximately 10 years old, either with his hand or a belt, although she could not remember the circumstances of the incidents. She explained when she previously denied Father hit her, she "didn't want to get him in trouble." She believed Father sold drugs because she saw "a lot" of weed in his house,

8

but she never witnessed him giving drugs to anyone. The child recently saw Father smoke weed on social media—she believed it was weed "[b]ecause that's . . . the only thing he does." She testified Father had not visited her since the instant case began and that she did not want him visiting her. She said Father called her recently and yelled at her. She stated she felt unsafe around him but was willing to call or text him. She was "scared" if he were to get mad, he would hit her again. She testified Father stopped picking her up for weekend visits more than a year before the instant case started.

Kristen Nichols, the intake social worker assigned to the case, testified as follows concerning Father. She recalled during the initial emergency response investigation, Father was uncooperative and made "concerning statements" regarding the child's well-being. The Agency then assigned Nichols to conduct an independent investigation. She assessed Father's home and had no concerns regarding Father at the time of the assessment. Nichols recalled the child had not stated any specific safety concerns regarding Father at that time and, during her interview with Father, Father was "cooperative" and "forthcoming." She did not see any substances in Father's home during the assessment. She testified she wrote an addendum to the detention report, recommending giving physical custody to Father. Nonetheless, the Agency was still concerned about Father because it received reports of Father using substances in the home and because the child expressed feeling unsafe with Father. Nichols expressed concern about Father's walking out of the detention hearing.

Esther Espinoza, the social worker assigned to the case, testified as follows pertaining to Father. According to Espinoza, Father said he did not want to visit the child because the child lied and "he was portrayed badly in court." Espinoza testified the child also declined visits with Father, because

the child felt unsafe with him after seeing drugs in his home. The child claims, according to Espinoza, Father "has an anger problem" and came "close to hitting her in the past." Mother also told Espinoza Father "had an anger problem" and that Mother experienced domestic violence.

The juvenile court amended the petition by interlineation and found the allegations against Mother and Father under section 300, subdivisions (b) and (j) to be true by a preponderance of the evidence. The following allegations were sustained as to Father, all under section 300, subdivision (b)(1):

Count b-1: "[Father] reported [the child] was not safe in [Mother]'s care and that [Mother] had been abusing [the child] for years. The child . . . reported that [Father] had drugs in the home the last time she was with him, and [Father] used to hit her as well in the past and does not feel safe returning to [Father]'s care. [The child] reported that she does not feel safe returning to [Father]'s care. . . . [Mother's] and [Father]'s physical abuse of [the child] places [the child] at substantial risk of physical and/or emotional harm."

Count b-2: "[Father] failed to protect the child . . . (age 14) from the physical abuse of [Mother]. On May 13, 2025, [Father] reported that [Mother] has continuously abused the child for years. [Father] reported . . . [Mother] stopped allowing him visitation with the child in 2024, but he failed to go to court and enforce his visitation with the child even though he believed the child was not safe with [M]other. [Father] reported that if the child is not placed with him, he does not want any communication or contact from anyone until his child is dead at the morgue because he is not going to keep playing games with [the Agency] and others who do not have his child's best interests at heart. [Father]'s failure to protect the child . . . from the

10

physical abuse by [Mother], places [the child] at substantial risk of physical and/or emotional harm."

Count b-3: "[Father] may have an unresolved substance use problem. [Mother] and the child . . . reported having concerns for [Father] and his prior drug use. The child . . . reported that [Father] had drugs, mainly marijuana in the home the last time she was in the home with him. [Father] also has a criminal history that includes drug related arrests including a violation of Health and Safety Code [section] 11352."

The juvenile court declared the child a dependent of the court under section 360, subdivision (d). It found the child "very credible," explaining:

"She had some hesitancy in disclosing some of the things that her parents have done. But it is clear that there is a history of multiple occasions of physical abuse by both parents. [The child] even indicated that she initially wasn't disclosing the physical abuse because she didn't want [Father] to get in trouble.

"We have Mother's statements to the [social] worker about Father's history of violence as well as Father's criminal history of violence. That makes it credible that these instances have occurred and that [the child] would be scared, because [Father] has clearly demonstrated throughout these court proceedings his inability to control his temper and that when things don't go his way, he acts out.

"As . . . Nichols testified, too, at the detention hearing when the [c]ourt made a detention finding and indicated after [the child]'s counsel's statements about the physical abuse concerns, [Father] got up from the proceedings, stormed out of the proceedings, and then has made comments about—basically, 'Call me when my daughter is dead.'

11

"In addition, [Father] knew, per his own statements, the physical abuse by [Mother] and chose to basically absent himself from the child's life for over two years, took no actions to protect her, didn't even visit her. There is more than a preponderance of the evidence to support the petition as it is amended."

The juvenile court found "by clear and convincing evidence [s]ection 361, [subdivision] (c)(1) applies and to vest custody with the parents would be detrimental to the child, and to vest custody with the [Agency] is required to serve the child's best interest." The court ordered Father to participate in individual counseling and programs for anger management and parenting for teens. It also ordered him "to submit to five random observed drug tests."

Father timely appealed.

## DISCUSSION

### I.

#### THE APPEAL IS NOT MOOT

In his opening brief, Father argues his appeal is not moot despite the unchallenged jurisdictional findings as to Mother. The Agency contends otherwise.

"A case becomes moot when events "'render[] it impossible for [a] court, if it should decide the case in favor of plaintiff, to grant him any effect[ive] relief.'"" (*In re D.P.* (2023) 14 Cal.5th 266, 276.) "[T]he principle that '[d]ependency jurisdiction attaches to a child, not to his or her parent' [citation], means that "'[a]s long as there is one unassailable jurisdictional finding, it is immaterial that another might be inappropriate.'" [Citation.] Thus, where jurisdictional findings have been made as to both parents but only one parent brings a challenge, the appeal may be rendered moot.

[Citation.] The same is true where there are multiple findings against one parent; the validity of one finding may render moot the parent's attempt to challenge the others." (*Id.* at pp. 283–284.) "As long as there is at least one unchallenged jurisdictional finding, the reviewing court may affirm the juvenile court's finding of jurisdiction over the child, regardless of whether other findings are supported by substantial evidence." (*In re Jayden A.* (2025) 111 Cal.App.5th 1334, 1343.)

"But according to our high court in [*In re*] *D.P.*, such an appeal is not moot if the challenged jurisdictional finding "'serves as the basis for dispositional orders that are also challenged on appeal.'" [Citation.] 'Because reversal of the jurisdictional finding calls into question the validity of orders based on the finding, review of the jurisdictional finding can grant the parent effective relief.' [Citation.] There is 'a specific legal or practical consequence that will be averted upon reversal.'" (*In re Jayden A., supra,* 111 Cal.App.5th at p. 1343.)

Notwithstanding the unchallenged jurisdictional findings as to Mother, this appeal is not moot. Father challenges the juvenile court's dispositional orders, including the placement of the child, asserting the dispositional orders "are based on erroneous jurisdictional findings." (Boldface and capitalization omitted.) "That is precisely the circumstance in which our high court has concluded that an appeal challenging jurisdictional findings against only one parent is not moot."[1] (*In re Jayden A., supra,* 111 Cal.App.5th at p. 1345.)

_____

[1] The amended petition contained three counts regarding Father, but Father challenges jurisdictional findings on only two, counts b-2 and b-3. The parties do not address whether "the validity of one finding may render moot the parent's attempt to challenge the others." (*In re D.P., supra,* 14

## II.

### STANDARD OF REVIEW

"'In reviewing a challenge to the sufficiency of the evidence supporting the jurisdictional findings and disposition, we determine if substantial evidence, contradicted or uncontradicted, supports them. "In making this determination, we draw all reasonable inferences from the evidence to support the findings and orders of the dependency court; we review the record in the light most favorable to the court's determinations; and we note that issues of fact and credibility are the province of the trial court." [Citation.] "We do not reweigh the evidence or exercise independent judgment, but merely determine if there are sufficient facts to support the findings of the trial court. [Citations.] "'[T]he [appellate] court must review the whole record in the light most favorable to the judgment below to determine whether it discloses substantial evidence . . . such that a reasonable trier of fact could find [that the order is appropriate].""'" (*In re I.J.* (2013) 56 Cal.4th 766, 773.)

## III.

### JURISDICTIONAL FINDINGS

A juvenile court may exercise jurisdiction if the court finds "[t]he child has suffered, or there is a substantial risk that the child will suffer, serious physical harm or illness, as a result of any of the following: [¶] (A) The failure or inability of the child's parent . . . to adequately supervise or protect the child. [¶] . . . [¶] (D) The inability of the parent . . . to provide regular care for the child due to the parent's . . . mental illness, developmental disability, or substance abuse." (§ 300, subd. (b)(1)(A) & (D).)

---

Cal.5th at p. 284.) Nonetheless, we conclude the appeal is not moot on this basis for the same reasons stated above.

"[T]o obtain a jurisdictional determination under section 300, subdivision (b)(1), an agency must 'prove three elements: (1) the parent's . . . neglectful conduct or failure or inability to protect the child; (2) causation; and (3) serious physical harm or illness or a substantial risk of serious physical harm or illness.'" (*In re S.F.* (2023) 91 Cal.App.5th 696, 712.) "Section 300 requires proof a child is subject to the defined risk of harm at the time of the jurisdiction hearing." (*In re Gilberto G.* (2024) 105 Cal.App.5th 52, 62.) "A court 'need not wait until a child is seriously abused or injured to assume jurisdiction and take steps necessary to protect the child.' [Citation.] And a parent's ""[p]ast conduct may be probative of current conditions' if there is reason to believe that the conduct will continue.'" [Citation.] However, "'[t]o establish a defined risk of harm at the time of the hearing, there 'must be some reason beyond mere speculation to believe the alleged conduct will recur.'""" (*In re S.F.,* at pp. 712–713.)

*A. Count B-2: Substantial Evidence Supports Jurisdiction Under Section 300, Subdivision (b)(1)(A)*

Substantial evidence supports the jurisdictional finding on count b-2 pursuant to section 300, subdivision (b)(1)(A). Father reported to a social worker he knew Mother abused the child in the past. Despite being aware of the abuse, he told a social worker he had not enforced his visitation rights when Mother withheld visitation. His failure to do so put the child in danger and at a substantial risk of physical harm.

Father argues the record does not support his failure to protect the child, given the Agency and courts "continuously allowed the child to remain in [M]other's care" regardless of reports of abuse. He asserts it "would have been fruitless" to report concerns regarding Mother. He cites his efforts two years ago when the child stayed at his home during the summer. He

15

mentions how an addendum to the detention report recommended releasing the child to Father but the Agency changed its position at the hearing. He posits the Agency misquoted his morgue comment. But, under our substantial evidence review, evidence that might suggest a contrary conclusion does not render it insufficient to support a jurisdictional finding.

*B. Count B-3: Substantial Evidence Does Not Support Jurisdiction Under Section 300, Subdivision (b)(1)(D)*

"Section 300[, subdivision] (b)(1)(D) allows for dependency jurisdiction based on substance abuse only when this abuse leads to an 'inability' on the part of a parent . . . 'to provide regular care for [a] child' [citation] that causes the child to suffer, or creates 'a substantial risk that the child will suffer, serious physical harm or illness.'" (*In re N.R.* (2023) 15 Cal.5th 520, 540.) The term "'substance abuse,' as it appears in section 300[, subdivision] (b)(1)(D)," bears its ordinary meaning: "the excessive use of drugs or alcohol." (*Ibid.*)

Here, insufficient evidence supports the jurisdictional finding on count b-3 under section 300, subdivision (b)(1)(D). The allegation in count b-3 sustained by the juvenile court is that Father "*may* have an unresolved substance use problem." (Italics added.) The word "may" is speculative. Significantly, no evidence supports the allegation that Father had a substance use problem. The child reported to a social worker and she testified she found marijuana in Father's home approximately two years before the instant case began. The child also testified she saw Father smoking marijuana on social media. Father's criminal history shows his last arrest and conviction was in 2008, far removed from today, and not drug related. Furthermore, there is no evidence how Father's marijuana use led to his

16

inability to care for the child and, as a result, the child suffered or was at significant risk of suffering serious physical harm or illness.

IV.

DISPOSITIONAL ORDERS

*A. The Drug Testing Order is Reversed*

Father argues the dispositional orders related to the jurisdictional findings should be reversed. As insufficient evidence supports the juvenile court's jurisdictional finding on count b-3 regarding Father's alleged "substance use problem," the dispositional drug testing order "aimed at eliminating *that* invalidated jurisdictional finding must also be reversed." (*In re S.F., supra,* 91 Cal.App.5th at p. 726.) "[I]n the absence of that jurisdictional finding, there is no nexus between the remaining valid conditions leading to the dependency and the challenged disposition order[]" regarding testing. (*Ibid.*)

*B. The Juvenile Court Properly Denied Father's Request for Custody*

Father argues the juvenile court erred in removing the child from the custody of the parents under section 361, subdivision (c)(1), which governs the removal of a child from custodial parents, because Father is a noncustodial parent. He argues the court should have applied section 361.2, which controls the placement of a child with a noncustodial parent following removal under section 361, and insufficient evidence supports a detriment finding under section 361.2.

Section 361, subdivision (c) provides in pertinent part: "A dependent child shall not be taken from the physical custody of their parents . . . with whom the child resides at the time the petition was initiated." At the time the petition was initiated, the child did not reside with Father. As the child did not reside with Father then, the juvenile court could not remove the

17

child from Father's physical custody under section 361, subdivision (c)(1). (See *In re Julien H.* (2016) 3 Cal.App.5th 1084, 1089 [finding section 361, subdivision (c)(1) did not apply where the child did not reside with his father when the petition was initiated].) The court therefore erred in applying section 361, subdivision (c)(1).

"Notwithstanding this conclusion, reversal is unwarranted unless the error resulted in prejudice, i.e., it is reasonably probable that a result more favorable to the appealing party would have been reached in the absence of the error." (*In re Julien H., supra,* 3 Cal.App.5th at p. 1089.)

The Agency argues, even if the juvenile court should have applied section 361.2, the court made the necessary detriment finding under section 361.2 and did not commit prejudicial error. Section 361.2, subdivision (a) provides: "If a court orders removal of a child pursuant to Section 361, the court shall first determine whether there is a parent of the child, with whom the child was not residing at the time that the events or conditions arose that brought the child within the provisions of Section 300, who desires to assume custody of the child. If that parent requests custody, the court shall place the child with the parent unless it finds that placement with that parent would be detrimental to the safety, protection, or physical or emotional well-being of the child. The fact that the parent is enrolled in a certified substance abuse treatment facility that allows a dependent child to reside with their parent shall not be, for that reason alone, prima facie evidence that placement with that parent would be detrimental."

Here, Father was a noncustodial parent who requested custody. The juvenile court made a detriment finding as to Father in writing and

18

orally on the record, as required under section 361.2, subdivision (c).[2] It stated at the jurisdiction and disposition hearing: "[T]o vest custody with the parents would be detrimental to the child." The court explained the basis of its detriment finding. And substantial evidence supported the detriment finding. The court found the child's testimony "very credible," including her testimony regarding Father's physical abuse in the past and her current fear of him especially when he becomes angry. Mother's statements regarding Father's abusiveness toward her in the past supported the child's testimony. Notwithstanding Father's frustration with prior court proceedings, he demonstrated he had some problems controlling his temper during the instant case, such as walking out of the detention hearing when it did not result in his favor and telling a social worker he did not want to communicate with the court or the Agency. Additionally, as discussed *ante*, Father failed to protect the child from Mother's abuse. We conclude any error in applying the wrong statute was harmless.

Father argues the juvenile court made no implied finding under section 361.2. He asserts implied findings are disfavored, citing several cases. For example, in *In re Abram L.* (2013) 219 Cal.App.4th 452, 463, an appellate court held, "[I]t is inappropriate to make implied findings when the juvenile court fails to make express findings as required by section 361.2, subdivision (c)." But we need not make an implied finding here. The court made an express finding, in writing and orally, that placement with Father would be detrimental to the child's well-being.

---

[2] Sections 361, subdivision (c) and 361.2 both require findings by clear and convincing evidence. (§ 361, subd. (c); *In re A.T.* (2025) 110 Cal.App.5th 722, 736 [discussing section 361.2].)

DISPOSITION

We reverse the juvenile court's jurisdictional finding on count b-3 under section 300, subdivision (b)(1)(D) and the related dispositional order regarding drug testing. In all other respects, the jurisdictional findings and dispositional orders are affirmed.


MOTOIKE, ACTING P. J.

WE CONCUR:


DELANEY, J.


GOODING, J.